CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 1 5 2006

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| MARVIN W. WOOLDRIDGE,<br>Plaintiff, | )<br>)<br>) |
| v. | ) Civil Action No. 6:05cv00029<br>) |
| JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | )<br>) By:  Hon. Michael F. Urbanski<br>)         United States Magistrate Judge<br>) |

## REPORT AND RECOMMENDATION

Plaintiff Marvin W. Wooldridge ("Wooldridge") brought this action pursuant to 42 U.S.C. § 405(g) for a review of the final decision of the Commissioner of Social Security denying his claims for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383. This case was referred to the undersigned Magistrate Judge on December 16, 2005 for report and recommendation. Having reviewed the record, and after briefing and oral argument, the case is now ripe for decision. As the undersigned finds substantial evidence to support the determination that Wooldridge is not disabled under the Act, it is recommended that the ALJ's decision be affirmed.

I

Plaintiff was born on October 10, 1956, and completed the tenth grade. (Administrative Record, hereinafter "R." at 18, 64, 296) Plaintiff's previous work includes that of a maintenance worker and carpenter. (R. 18, 81, 297-99) Plaintiff filed an application for SSI on February 5, 2003 alleging he became disabled on March 30, 2002, due to a back disorder and an affective disorder. (R. 17, 18, 300, 302) Plaintiff's claims were denied at both the initial and reconsideration levels of administrative review, (R. 17), and an administrative hearing was held

before an administrative law judge ("ALJ") on February 9, 2005. (R. 293-311) On April 29, 2005, the ALJ issued a decision denying plaintiff's claim for SSI, finding plaintiff retained the residual functional capacity ("RFC") to perform light work, requiring lifting up to twenty pounds occasionally and ten pounds frequently; standing, walking or sitting up to six hours in an eight-hour workday; with no climbing, bending, stooping, twisting, or prolonged standing or walking; with moderate limitations in concentration but the ability to perform simple, routine, repetitive tasks; and with mild limitations in the ability to cope and interact with peers, supervisors, and the general public. (R. 31)

The ALJ's decision became final for the purposes of judicial review under 42 U.S.C. § 405(g) on June 17, 2005, when the Appeals Council denied plaintiff's request for review. (R. 8-11) Plaintiff then filed this action challenging the Commissioner's decision.

## II

Plaintiff first argues that the ALJ erred in failing to give controlling weight to the opinion of the plaintiff's treating physician, Dr. Hopkins. Plaintiff also alleges the ALJ improperly evaluated his mental impairments. Specifically, Wooldridge claims the ALJ erred by failing to follow the opinion of a state agency non-examining physician, Dr. Entin.

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that plaintiff failed to meet the conditions for entitlement established by and pursuant to the Act. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). Stated briefly, substantial evidence has been defined as such relevant evidence, considering the record as a whole, as might be found

2

Case 6:05-cv-00029-NKM-mfu   Document 21   Filed 05/15/06   Page 2 of 13   Pageid#: 70

adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971).

### III

Plaintiff contends that the ALJ failed to give controlling weight to his treating physician's opinion regarding the limitations caused by plaintiff's back condition. The record indicates Wooldridge saw Dr. Hopkins of Blue Ridge Orthopedics on January 29, 2002, complaining of left shoulder and arm injuries obtained in a fall at home. (R. 137) Notes indicate x-rays of the shoulder and arm taken after the fall were negative, and though plaintiff complained of ongoing pain in his left forearm, "[h]e [was] using it pretty well." (R. 137) Dr. Hopkins noted plaintiff had been seen for left shoulder pain the previous year, at which time he failed to follow up with physical therapy. (R. 137) Examination revealed limited neck motion, as well as painful extension and left lateral bending. (R. 137) X-rays of the cervical spine taken that day showed congential fusion at 2, 3, minimal straightening of the lower cervical spine, and slight degenerative changes that were "not nearly as impressive" as expected. (R. 137-38)

Plaintiff returned to see Dr. Hopkins on February 25, 2002, stating he was "a little bit better." (R. 138) Dr. Hopkins noted plaintiff needed a home program and home traction set; Dr. Hopkins continued Wooldridge on his medications and encouraged him to look into alternative work possibilities. (R. 138) Surgery was not recommended. (R. 138) After a number of prescription refills, plaintiff saw Dr. Hopkins again nearly two years later on December 18, 2003. (R. 135) He complained of low back pain that began one year prior to this visit. (R. 135) His chronic neck pain and left arm pain was noted to be "status quo." (R. 135) Plaintiff reported being unable to work for one year, as he had been waiting for his pain to improve. (R. 135) X-

3

rays revealed significant spondylolisthesis,[1] grade III; a 50% slip; and a lumbosacral disc that is "just obliterated." (R. 135) Dr. Hopkins recommended conservative treatment but stated there was a chance Wooldridge would require future surgery. (R. 135) Dr. Hopkins noted "[i]t is also possible he may have to look into training to do something else...." (R. 135)

On January 6, 2004, plaintiff returned to Dr. Hopkins and while assessed as "better," the doctor noted he was still suffering from a fair amount of symptoms. (R. 136) Dr. Hopkins also stated "[t]o get him back into the work place I think he is going to need a little bit of medical help," through either Vocational Rehabilitation or Medicaid. (R. 136) Dr. Hopkins recommended physical therapy, repeat injections, and chronic medication; he noted a slight chance that plaintiff would require surgery. (R. 136) On February 10, 2004, plaintiff was again assessed as doing "better" but still struggling with physical capabilities. (R. 136) He reported working with Vocational Rehabilitation, and Dr. Hopkins noted "I think finding a job that he could do is the key." (R. 136)

Wooldridge returned on March 17, 2004, at which time his medical care was covered by Vocational Rehabilitation. (R. 278) He had been attending physical therapy sessions, but reported that he was still struggling. (R. 278) Dr. Hopkins noted training for a different line of work would make sense for plaintiff, and he recommended repeating the Depo-Medrol injection and continued physical therapy. (R. 278) Upon examination, the doctor noted a standing flexion lateral showed a slight increase, just beyond the 50% mark, and some additional remodeling of the contiguous bone at the L-5 vertebra. (R. 278) Dr. Hopkins again referenced the possibility of

---

[1] According to Dr. Hopkins, "one vertebrae [sic] has slid forward on the others secondary a bony insufficiency." (R. 266)

4

surgery for stabilization, but continued to treat plaintiff conservatively for the time being. (R. 276) Plaintiff saw Dr. Hopkins again on April 21, 2004 after making some progress with physical therapy. (R. 276) Wooldridge reported having back, buttock and thigh pain but stated his leg pain was largely gone. (R. 276) As for his "bureaucratic" problem regarding Medicaid ineligibility, plaintiff mentioned applying for disability, but Dr. Hopkins noted he was not sure that would be appropriate. (R. 276) Dr. Hopkins suggested plaintiff look into job training and consider doing something different. (R. 276)

An MRI was performed on May 21, 2004, revealing grade III spondylolysis of L5 on S1 with some irregularity of the posterior inferior end plate of L5, bilateral spondylolyses of pars at that level, and evidence of a diffusely bulging annulus. (R. 255) At L4-5, a diffusely bulging annulus was seen with a broad based central focal bulge with questionable clinical significance and no neural foraminal narrowing. (R. 255) A mild annular bulge was seen at L3-4 which narrowed the inferior neural foramina bilaterally but did not impact exiting nerve roots. (R. 255) Additionally, the MRI revealed little facet arthropathy bilaterally in the lower lumbar spine. (R. 255)

On May 26, 2004, plaintiff visited Dr. Hopkins again, at which time the doctor noted plaintiff has "good and bad days." (R. 271) Dr. Hopkins reported plaintiff's MRI showed no disc herniation or nerve root compression. (R. 271) The doctor prescribed more physical therapy and expressed hope that Wooldridge might be able to find a job he could do to get him back into the workplace, if he could live with his back pain. (R. 271) On July 7, 2004, Dr. Hopkins stated "[p]atient seems to be making progress." (R. 270) Plaintiff reported less back pain, better sleep. (R. 270) Dr. Hopkins stated surgery and an epidural steroid were unnecessary at the time; the

5

key was to try to get plaintiff back into the workplace. (R. 269) On October 6, 2004, plaintiff returned to Dr. Hopkins, reporting he was doing better. (R. 268) Dr. Hopkins stated an epidural steroid would help answer the question of whether surgery was necessary. (R. 268)

After an epidural steroid injection, plaintiff reported feeling much better on December 6, 2004. (R. 265) As a result, Wooldridge cut back on his pain medications. (R. 265) Again, Dr. Hopkins suggested plaintiff get back into the workplace. (R. 264) On January 3, 2005, plaintiff returned to see Dr. Hopkins, who recommended another epidural steroid. (R. 279) The possibility of future surgery was again mentioned, but the doctor continued plaintiff on a conservative treatment regimen. (R. 280) Examination revealed plaintiff stood tilted forward and to the left. (R. 280) Plaintiff was able to bend forward about eight inches from the floor but with no extension and no lateral bending, particularly to the right. (R. 280) Wooldridge was able to heel and toe walk with a bit of difficulty. (R. 280) Straight leg raising was negative to eighty degrees, and sensation was grossly normal. (R. 280) Plaintiff reported doing a bit of carpentry work at home, and Dr. Hopkins noted that the possibility of a job where plaintiff "drives people around" was reasonable. (R. 279)

The Fourth Circuit gives great weight to the opinion of a treating physician, for such opinion reflects expert judgment based on continuous observation of a patient's condition over a prolonged period of time. Smith v. Schweiker, 795 F.2d 343, 345-46 (4th Cir. 1986); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). However, the Commissioner is not bound by a treating physician's opinion. Mitchell, 699 F.2d at 187. The treating physician rule does not require that the testimony of a treating physician be given controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (citing Campbell v. Brown, 800 F.2d 1247, 1250 (4th Cir.

6

1986)). The ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence. Foster v. Heckler, 780 F.2d 1125, 1127 (4th Cir. 1986). If a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Plaintiff argues the ALJ failed to give controlling weight to the opinion of Dr. Hopkins regarding plaintiff's need to lie down during the day and the unpredictable nature of plaintiff's condition. (Pl.'s Br. 5) The problem with Wooldridge's argument is that Dr. Hopkins does not say that plaintiff is disabled from all work. Instead, Dr. Hopkins acknowledges plaintiff has "good and bad days" but states plaintiff needs to find a job he can do, which allows changing positions as need be, with some sitting, some standing, some walking. (R. 227) A fair reading of Dr. Hopkins' medical records indicates Wooldridge is not precluded from all employment. Dr. Hopkins repeatedly notes that the key for plaintiff is finding a job he can do. (R. 135, 136, 264, 269, 270, 271, 276, 278, 279)

Regarding a visit on May 26, 2004, Dr. Hopkins wrote:

> We are left with a symptomatic spondylolisthesis in a patient whose problem is primarily social. I think it is a question of finding something that he can do. He can clearly do trim work but contractors are not willing to hire him for that alone as they don't think that is fair to their other employees which means, on occasion, he is going to have to climb, lift, twist and do things for which his back is not going to hold up. I think that clearly if we could find him another job, tap into his skills and experience but without being the same level of demand that would be quite helpful.

(R. 269-70) Regarding a visit on July 7, 2004, the doctor noted:

> Patient seems to be making progress. There is less back trouble at this time. He is working with Millie Hall at VR and evidently they

7

are looking at other job possibilities. He has gotten a job coach.
They have taken his resume and they are out looking... I think the key
here is to try and get him back into the work place, find something
that is suitable. He does have a chronic spondylo but right now I
don't think surgery is necessary. An epidural steroid remains a
possibility but I think we can hold off for now. We will recheck here
in 2-3 months, sooner if there is a problem.

(R. 269-70) A few months later, on October 6, 2004, the doctor noted:

> He tried to return to work. He worked eight days, general
> maintenance I think at a hotel, and he just got significant back and
> right leg pain. He had difficulty walking, so he stopped work. Since
> he has done that, things have settled down a bit. I think the big
> question to be answered here is, does surgery have anything to offer?
> Or is there a job that he could be trained for that would be so limited
> physically that he could actually do it?

(R. 269) On November 2, 2004, Dr. Hopkins responded to written questions submitted by a state agency medical consultant, Pamela S. Duff, M.D., stating that plaintiff's chronic back condition of spondylolisthesis with radiculopathy results in periodic symptoms. (R. 266) Dr. Hopkins wrote:

> Certainly, the patient's previous level of employment that was
> physically demanding, awkward positioning, heavy lifting, was more
> than his back would hold up to. If he could be trained into something
> that was less demanding, that would have potential. Moreover, he
> has already responded to some conservative treatment.

(R. 266) A month following the administration of the epidural steroid, on December 6, 2004, Wooldridge reported "feeling much better." (R. 265) Again, at that time, Dr. Hopkins' notes mentioned getting Wooldridge back in the workplace:

> I think the next question is to see if we can get him back into the
> work place in some type of limited fashion. I don't think that his
> back is going to hold up to finish carpentry work but I would not
> totally rule that out. I think a better idea would be to see whether VR
> could come up with something that he could do that was less
> physically demanding and that his back would hold up to.

8

(R. 264)

Consistently, Dr. Hopkins' letter of September 2, 2004 to Wooldridge's counsel does not indicate that he is disabled from all work. (R. 227-28) In fact, the letter states that Wooldridge can work in certain capacities, although his capabilities are greater on good days than they are on bad days. (R. 227-28)

In short, the treating physician rule does not require reversal or remand of this case. Rather, the consistent theme of Dr. Hopkins's notes is that Wooldridge ought to return to work in some capacity. Contrary to plaintiff's assertions, the ALJ did in fact properly rely on Dr. Hopkins' opinion, which was that plaintiff needed to obtain a job. (R. 27) Substantial evidence in the record supports the ALJ's decision.

## IV

Wooldridge also contends that the ALJ erred by failing to properly consider the opinion of Dr. Entin, a state agency non-examining physician, as to plaintiff's mental residual functional capacity. Dr. Entin completed a Mental Residual Functional Capacity Assessment form on July 10, 2003. (R. 181-83) On that form, Dr. Entin noted marked limitations in Wooldridge's ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to interact appropriately with the public, and ability to set realistic goals or make plans independently of others. (R. 181-82) Dr. Entin noted moderate limitations in Wooldridge's ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 181-82) While noting limitations in these seven

9

areas, Dr. Entin's form indicates that Wooldridge is not significantly limited in any of the other thirteen categories. (R. 181-82)

Woodridge's reliance on Dr. Entin's report is undermined by the narrative portion of Dr. Entin's report which states as follows:

> This claimant states depression is one reason he is unable to work. He states depression has been present for many years; however, he has generally been able to function at least adequately while depressed and anxious. His ability to understand and carry out simple instructions is not impaired. Examining psychologist concludes that his ability to handle simple and repetitive tasks is unlimited. He may have some mildly impaired ability to cope with peers or supervisors.

(R. 183) Therefore, considered as a whole, Dr. Entin's report does not support Wooldridge's argument that he is disabled from all work.

Furthermore, other psychologists, including Drs. Kessler and Hamilton, stated that Wooldridge had only mild limitations of functioning. (R. 180, 221) Dr. Hamilton found Wooldridge's impairments not to be severe in a form entitled Psychiatric Review Technique, concluding that the "[e]vidence does not reveal a severe mental impairment. The claimant has some mild difficulties with anxiety or depression but has not had any recent treatment. Allegations are considered to be partially credible." (R. 225) While Dr. Hamilton's evaluation, like that of Dr. Entin, appears to be based on a records review, Dr. Kessler examined Wooldridge and had the opportunity to interview and clinically assess him. (R. 176-80) Indeed, in his functional assessment of Wooldridge, Dr. Kessler stated:

> Mr. Wooldridge is likely to experience breaks in concentration that moderately limit but do not preclude his ability to handle complex and detailed tasks. His ability to handle simple and repetitive tasks is unlimited. Workplace attendance should not present a significant problem and he seems to be able to handle the stress of a full-time workweek. His ability to cope and interact with peers, supervisors

10

and the general public is mildly impaired, given his description of the
conflicts he has experienced in the past.

(R. 180) Dr. Kessler assessed Wooldridge's Global Assessment of Functioning (GAF)[2] level at

62, which denotes only some difficulty in social, occupational, or school functioning.

However, Dr. Pantaze, in his psychological evaluation, pegged Wooldridge's GAF

somewhat higher, at 70, and noted plaintiff "tends to exaggerate his conditions/situation."

(R. 263) Dr. Pantaze concluded:

> If Mr. Wooldridge is successful in obtaining his SSI benefits he will
> have no interest in employment. Even if he does not obtain his
> benefits his likihood [sic] of maintaining stabilized employment [is]
> quite to very guarded. Psychotherapy will have limited usefulness in
> propelling Mr. Wooldridge toward employment related activities.

(R. 263)

Given this record, Wooldridge is wrong to suggest that the ALJ failed at Step 5 to

accurately consider his mental status. The hypothetical question posed to the vocational expert

clearly took into account Wooldridge's mental impairments established by the record, as follows:

> Q: Let's presume he['s] got the same limitations as the first
> hypothetical, but let's also presume that due to his mental
> impairments, he would likely experience breaks in concentration that
> moderately limit his, but do not preclude, his ability to handle
> complex and detailed tasks. His ability to handle simple and
> repetitive tasks is unlimited. Work place attendant [sic] should not
> present a significant problem as he [is] able to handle [the] stress [of
> a] full-time workweek. His ability to cope and interact with peers,
> supervisors, and the general public is mildly impaired given his

---

[2] The GAF scale is a method of considering psychological, social and occupational
function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with
serious impairment in functioning at a score below 50, moderate difficulty in functioning at 60 or
below, some functioning difficulty at 70 and below, and so forth. American Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

11

> prescription of the conflicts he experienced in the past. With those type of limitations, are there any jobs that would exist in significant numbers in the national economy?
>
> A: All of the jobs that I mentioned previously, Your Honor, are representative.

(R. 309)

It is well established that in order for a vocational expert's testimony to be relevant or helpful, it must be based upon consideration of all evidence in the record, and it must be in response to a proper hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The existence and extent of those impairments is a matter to be decided by the ALJ, and will be upheld by the court if supported by substantial evidence. Wells v. Chater, No. 94-2186, 1995 U.S. App. LEXIS 17252, at * 4-5 (4th Cir. July 7, 1995). The Commissioner may not rely upon the vocational expert's answer to a hypothetical question if the hypothesis does not fit the facts. Swaim v. Califano, 599 F.2d 1309, 1312 (4th Cir. 1979). The hypothetical question given to the vocational expert by the ALJ in this case fairly set out plaintiff's mental limitations as established by the evidence of record. As such, the vocational expert's testimony may be relied upon.

Accordingly, the ALJ's decision as to plaintiff's mental impairments is supported by substantial evidence.

V

Based on the foregoing, it is the recommendation of the undersigned that plaintiff's motion for summary judgment be denied and defendant's motion for summary judgment be granted.

12

In making this recommendation, the undersigned does not suggest that plaintiff is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. It is recommended, therefore, that defendant's motion for summary judgment be granted.

The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

**ENTER:** This 15 day of May, 2006.

Michael F. Urbanski
United States Magistrate Judge